**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Francisco Javier Ramos, | ) | No. CV-13-02368-TUC-BGM |
| Plaintiff, | ) | |
| vs. | ) | **ORDER** |
| Carolyn W. Colvin, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 15). Defendant filed her Opposition to Plaintiff's Opening Brief ("Response") (Doc. 16), and Plaintiff filed his reply (Doc. 17). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.   BACKGROUND

### A.   *Procedural History*

On June 14, 2011, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of July 5, 2009 due to left ear loss of hearing, gout in his fingers, diabetes, high blood pressure, and right and left Achilles tendon injuries. *See* Administrative Record ("AR") at 23, 25, 39, 59, 71, 85, 92, 148, 150, 180, 197, 206, 256. Plaintiff's date last insured was September 30, 2014. *Id.* at 59, 71, 180, 206, 256.

The Social Security Administration ("SSA") denied this application on October 21, 2011. *Id.* at 23, 58-69, 85-88.  On November 29, 2011, Plaintiff filed a request for reconsideration, and on March 14, 2012, SSA denied Plaintiff's request.  *Id*. at 23, 70-84, 89, 92-94.  On April 11, 2012, Plaintiff filed his request for hearing.[1]  *Id.* at 23, 95.  On October 4, 2012, a hearing was held before Administrative Law Judge ("ALJ") Laura Havens.[2]  AR at 23, 35-57.  The ALJ issued an unfavorable decision on October 19, 2012.  *Id.* at 20-30.  On December 6, 2012, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on November 13, 2013, review was denied.  *Id.* at 2-5, 19.  On December 19, 2013, Plaintiff filed this cause of action.  Compl. (Doc. 1).

## B.   *Factual History*

Plaintiff was sixty-one (61) years old at the time of the administrative hearing and fifty-eight (58) at the time of the alleged onset of his disability.  AR at 39, 59, 71, 150, 180, 206, 256.  Plaintiff has a high school diploma, and has taken two years of college.  *Id.* at 39, 58, 70.  Currently, Plaintiff works part-time as a cashier at Circle K.  *Id.* at 25, 40-41, 156, 172, 177.  Prior to his alleged disability, Plaintiff owned a gift shop, and worked as a retail sales clerk, and a produce inventory control clerk.  *Id.* at 41-42, 68, 82, 160-67, 184-87, 198, 235, 245-46.

On December 23, 2011, Estela O. Felix, a long time friend of Plaintiff, filled out a Function Report regarding Plaintiff.  *Id.* at 217-24.  Ms. Felix described Plaintiff's daily activities as "gets up[,] showers, goes shopping, pays bills, has breakfast, lunch, [and] dinner, works 4 to 5 hr. a day, takes wife to [doctor] appointment, take care of wife that [sic] is 100% disable[d]."  AR at 217.  Ms. Felix stated that Plaintiff cares for his wife.  *Id.* at 218.  Ms. Felix further described Plaintiff prior to his disability as "[a] very active person at work [and]

---

[1]Plaintiff filled out a form "Request for Hearing by Administrative Law Judge" and signed it April 9, 2012, but it appears to have been filed on April 11, 2012.

[2]The ALJ's decision states that the hearing was held on October 3, 2012; however, the hearing transcript is dated October 4, 2012.

with the community and sports." *Id.*  She also stated that Plaintiff has pain and "need[s] to take medication to be able to sleep [and] control pain[.]" *Id.*  Ms. Felix stated that Plaintiff does not need any help with his personal care. *Id.* at 218-19.  Ms. Felix further indicated that Plaintiff does not cook, unless his wife is unable to do so.  AR at 219.  Ms. Felix stated that Plaintiff does laundry and vacuums approximately two (2) hours per week. *Id.*  She also reported that Plaintiff goes outside every day, and can go out alone, as well as drive. *Id.* at 220.  In addition, Ms. Felix stated that Plaintiff goes out twice per week for a couple of hours to shop for groceries, prescriptions, and clothes. *Id.*  Ms. Felix further reported that Plaintiff can pay bills, count change, handle a savings account, and use a checkbook. *Id.* at 220.  Ms. Felix stated that Plaintiff watches news on television, as well as sports, for short periods.  AR at 221.  Ms. Felix also reported that although Plaintiff has "slow[ed] down in all of his activities about 70%[,]" "he does well with his limitations[.]" *Id.*  Ms. Felix said that Plaintiff spends times with other people, talking with customers, going to work and church, visiting his family, although she estimates that Plaintiff has decreased such activities by approximately 70%. *Id.* at 221-22.  Ms. Felix reported that Plaintiff has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, climbing stairs, seeing, and using his hands. *Id.* at 222.  Ms. Felix explained that gout affected Plaintiff's joints, he lost hearing, 90% on the left and 58% on the right, he has issues with his Achilles tendons, and cataracts in both eyes. *Id.*  Ms. Felix reported that Plaintiff is right handed, can walk for fifteen (15) minutes and then requires a fifteen (15) minute rest before resuming walking.  AR at 222.  Ms. Felix also reported that Plaintiff has no trouble paying attention or following instructions, handles stress well, and can adapt to changes in routine. *Id.* at 222-23.  Ms. Felix reports that Plaintiff uses a cane, and has glasses and a hearing aid, all prescribed by a doctor. *Id.* at 223.  Finally, Ms. Felix stated that despite Plaintiff's pain, he does not complain. *Id.* at 224.

On January 15, 2012, Plaintiff's son, Francisco J. Ramos, Jr., filled out a Function Report on his behalf. *Id.* at 227-34.  Mr. Ramos described his father's day as starting "by

taking a bath, go out shopping, pay bills, have lunch, go out and work 4-5 hours a day, come home, watch the news and go to sleep." AR at 227. Mr. Ramos indicated that Plaintiff takes care of his wife, taking her to doctor's appointments and out shopping. *Id.* at 228. Mr. Ramos reported that "[b]efore 2009 he was able to work 70 [hours] a week[,] [but] [n]ow with his disability he can't works [sic] those hours." *Id.* Mr. Ramos further reported that "[t]he pain in [Plaintiff's] joints does not allow him to sleep well at night[,] [and] [h]e is taking medication right now but it doesn't seem to help with the pain." *Id.* Mr. Ramos stated that Plaintiff does not have any problems with personal care, or need help remembering to do things like take his medication. *Id.* at 229. Mr. Ramos also stated that his mother cooks for Plaintiff, because [h]e cannot be standing for long period[s] of time and his constant pain with his joints." AR at 229. Mr. Ramos reported that Plaintiff "is able to do minor work [and] assist [Mr. Ramos's] mother with the laundry and dusting around the house." *Id.* Mr. Ramos further reported that Plaintiff goes out every day, can drive a car, and can go out unaccompanied. *Id.* at 230. Mr. Ramos also reported that during Plaintiff's trips out, he buys groceries and picks up prescriptions. *Id.* Mr. Ramos stated that Plaintiff can pay bills, count change, handle a savings account, and use a checkbook. *Id.* Mr. Ramos further stated that Plaintiff "enjoys reading and watch[ing] the TV news[,] [which] . . . [h]e does [] every evening for a couple of hours depending of [sic] how he feels." AR at 231. Mr. Ramos also stated that previously Plaintiff "was able to enjoy TV for a longer period of time, but with his hearing problem and joints he tends to watch less TV and read less because of the pain." *Id.* Mr. Ramos reported that Plaintiff "attends Sunday Mass." *Id.* Mr. Ramos observed that Plaintiff "limits himself with the family now and on the phone due to his hearing loss." *Id.* at 232. Mr. Ramos reported that Plaintiff's conditions affect his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, understanding, and using his hands. *Id.* Mr. Ramos stated that Plaintiff "is able to carry at least 10 pounds due to his pain in his hands and joints[,] [h]e is not able to stand for a long period of time due to his [A]chilles tendonitis [sic] and now with hearing problem[,] [h]e has a hard time hearing

others." AR at 232. Mr. Ramos reported that Plaintiff is right handed, can walk a "couple of hundred yards" before he needs to stop, and must rest 5-10 minutes before resuming walking. *Id.* Mr. Ramos stated that Plaintiff has not problem paying attention, and can follow written and verbal directions. *Id.* Mr. Ramos further stated that Plaintiff handles stress and change very well. *Id.* at 233. Mr. Ramos reported that Plaintiff "is less active due to his pain and hearing problem[,] [and] . . . has been more quiet with the family." *Id.* Mr. Ramos further reported that Plaintiff uses a cane, hearing aid, and glasses, all of which were prescribed by a doctor. AR at 233. Finally, Mr. Ramos reported that Plaintiff "constantly complain[s] about pain[,] [and] [m]edication doesn't seem to be helping." *Id.* at 234.

On February 13, 2012, Plaintiff reported that he lived in a house with family. *Id.* at 247. Plaintiff stated that he "used to work 7 days/wk – 70 [hours][,] [and] [i]n 2008 due to health reduced [hours] 20-28 a week." *Id.* Plaintiff further stated that his Achilles tendon and gout affect his standing, and high blood pressure and diabetes limits physical work. *Id.* Plaintiff described his day as "getting up early – shower, shave, go to work a few hours, then come home [and] take wife (disabled) for shopping, [doctor's] [appointments], pay bills, etc." AR at 248. Plaintiff reported caring for his wife, and doing laundry. *Id.* Plaintiff further reported that prior to his illness he was able to "work more [hours], play baseball, [and] swim." *Id.* Plaintiff also reported that his conditions affect his sleep, and he uses Tylenol PM to get to sleep. *Id.* Plaintiff stated that he has no problems with personal care, and his wife does the cooking, although he will cook on days that she is not able. *Id.* at 249. Plaintiff also stated that he does laundry, small repairs on the house, and vacuums. AR at 250. He does not require encouragement or assistance to do these tasks, goes out every day, can drive a car, and go out unaccompanied. *Id.* Plaintiff reported that he goes to the store and buys groceries and prescriptions or other items needed. *Id.* Plaintiff further reported that he is able to pay bills, count change, handle a savings account, and use a checkbook. *Id.* at 251. Plaintiff stated that his television viewing is limited due to his sight and hearing, although he does watch television daily. *Id.* Plaintiff stated that he spends time with others

daily, but his hearing problem affects socializing.  AR at 251.  Plaintiff further stated that he attends church regularly.  *Id.*  Plaintiff reports no problems getting along with others, although he is more reserved socially.  *Id.* at 252.  Plaintiff reported that his conditions affect his lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, stair climbing, seeing, and using hands.  *Id.*  Plaintiff further reported that he is right handed, and he can walk 200-300 yards before he needs to rest for a few minutes.  *Id.*  Plaintiff stated that he had no limitations on his ability to pay attention, follow written or spoken instructions, handle stress, or changes in routine.  AR at 252-53.  Plaintiff indicated that his hearing loss has caused a fear of a fire or other problem occurring.  *Id*. at 253.  Plaintiff stated that he has a cane, hearing aid, and glasses, all prescribed by a doctor.  *Id.*  Plaintiff indicates that although he is on several medications, they do not have side effects, and that he needs cataract surgery, but does not have insurance.  *Id.* at 254.

### 1.  Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that the pain of the Achilles tendon in his right foot, kidney stones, and gout, became increasingly worse resulting in his inability to work as of July 5, 2009.  AR at 39-40.  Plaintiff further testified that he returned to work at Circle K on March 15, 2011, part time, because he and his wife needed money for medical bills.  *Id*. at 40-41.  Plaintiff also testified that he suffers from diabetes, high blood pressure, gout, Achilles tendinitis, cataracts, lumbar degenerative disc disease, osteoarthritis, kidney stones, and arthritis in his hands.  *Id*. at 41.

Plaintiff testified that he lives in a house with his wife of forty plus years.  *Id.* at 42, 247.  Plaintiff further testified that he wakes up around 10:00 or 11:00 a.m., bathes, gets dressed, does household chores including cooking, washing dishes, mopping or sweeping, laundry, and grocery shopping.  *Id.* at 43, 51.  Plaintiff testified that he does not have any hobbies other than watching the news on television.  AR at 43.  Plaintiff further testified that although he is in motion "all the time[,]" he does not exercise.  *Id.*  Plaintiff testified that he drives, and can probably go a couple of hours in the car.  *Id.*  Plaintiff further testified that

he does not have any problem eating, but does have problems sleeping.  *Id.* at 43-44.
Plaintiff testified that he takes Tylenol P.M. to help him with the pain and to fall asleep.  *Id.*;
*see also* AR at 248.  Plaintiff stated that although he spends about twelve (12) hours in bed,
he is only sleeping between six (6) and seven (7) hours per night.  AR at 44.

Plaintiff testified that he sees a doctor approximately every three (3) months at
Mariposa Community Health Center for prescription refills and laboratory analyses.  *Id.* at
44-45.  Plaintiff reported that the medications cause sleeplessness, diarrhea, and sunburn –
as if he is "allergic to the sun."  *Id.* at 45.  Plaintiff testified that he has been on his feet for
his work for eight hours, and he does not like to sit, "because if I'm sitting down for so long
it's like my body gets stiff or uptight."  *Id.* at 45.  Plaintiff further testified that the twenty-
four (24) hours per week he works is in eight (8) hour shifts; however, his employer
accommodates his needs by scheduling Plaintiff in a way that maximizes his ability to rest
and recover after a shift.  *Id.* at 45-46.

Plaintiff testified that he has not been able to lift more than twenty (20) pounds since
1988.  *Id.* at 46.  Plaintiff also testified that he is able to grasp a book or a cup, use a register,
and sense hot and cold in his hands.  AR at 46.  Plaintiff further testified that he has "bad
days and . . . worse day[s,]" because he has pain every day.  *Id.* at 47.  Plaintiff testified that
on a scale of one (1) to ten (10), with ten (10) being the most severe, his daily pain is
between a four (4) and seven (7), averaging approximately six (6).  *Id.*  Plaintiff explained
that the pain from his Achilles tendon is as if someone were "nailing something on the
bottom of [his] tendon[,] . . . in [his] knee it comes from the side[,] . . . in [his] back, lower
back it's just something right under [him] that's burning and . . . it's like a baseball side here
in [his] back that it hurts and the ones over here from the beginning of the rib cage to the
middle, right here which is the kidney pain . . . [a]nd [his] right shoulder . . . [he] cannot lift
[his] hand all the way up because that hurts."  *Id.* at 47-48.  Plaintiff testified that he has had
four (4) surgeries in each hand, an appendectomy, surgical procedures for his kidney stones,
and surgeries on his Achilles tendons.  *Id.* at 49.  Plaintiff further testified that he did not

have surgery when he broke his clavicle, and they healed slightly overlapped. AR at 49.

Plaintiff testified that he originally went to work at Circle K as a full time employee in March 2011. *Id.* at 50. Plaintiff further testified that the forty (40) hours was too much, so his employer reduced his hours, and moved him to a lower traffic store in an effort to accommodate Plaintiff's health issues. *Id.* at 50. Plaintiff also testified that the fatigue increases his pain. *Id.* Plaintiff testified that on his "worse days" he spends a lot of time napping and resting. *Id*. at 51. Plaintiff further testified that sitting for too long causes his body to get stiff. AR at 51.

## 2. Vocational Expert Tracy Young's Testimony

Tracy Young testified as the vocational expert at the administrative hearing. *Id.* at 52-56. Ms. Young described Plaintiff's prior substantial gainful activity as a small business owner, Dictionary of Occupational Titles ("DOT") number 185.167-046, a light, skilled job, with a Specific Vocational Preparation ("SVP") of 7, although Plaintiff performed it as at least medium. *Id.* at 52. Ms. Young described Plaintiff's prior work as a wholesale sales representative of food products as DOT number 260.357-014, a light, skilled job, with an SVP of 5. *Id.* at 52-53. Ms. Young described Plaintiff's prior work as an inventory control clerk as DOT number 219.387-030, a light, skilled job, with an SVP of 5. *Id.* at 53. The ALJ asked if "these jobs [held] any transferable skills to sedentary work." *Id.* Ms. Young testified that possibly sales skills would transfer to sedentary work. AR at 53. The job Ms. Young suggested as using transferable skill would be a customer order clerk, DOT code 249.362-026, sedentary, semiskilled, with an SVP of 4. *Id.* Ms. Young testified that there are about 90,600 such jobs nationally, and approximately 1,630 jobs in Arizona. *Id.* at 54.

The ALJ asked the VE a hypothetical regarding an individual of the same age, education, and vocational background as the Plaintiff. *See id.* at 54. In the hypothetical, the ALJ asked about someone who could "sit six hours out of an eight hour day, stand four hours out of an eight hour day and walk four hours out of an eight hour day, requires a sit, stand option to perform a job, can occasionally lift and carry 20 pounds, frequently lift and carry

10 pounds, can only occasionally climb stairs, never climb ladders, occasionally balance, stoop, kneel, crouch and crawl[,] and . . . must avoid concentrated exposure to heights, moving machinery and excessive noise." *Id.* at 54. The ALJ inquired whether such an individual could perform "any of the jobs performed by [Plaintiff] in the past either as he performed them or as they're performed in the national economy." AR at 54. Ms. Young testified that small business owner would be eliminated, but the inventory control clerk and sales representative food products jobs would be available. *Id.* at 54-55. Ms. Young further testified that although this would be a deviation from the DOT, she based her opinion on her personal experience as a vocational rehabilitation counselor since 1983. *Id.* at 55. Plaintiff's counsel asked if the hypothetical person could not do the work "more than three days in a row would that erode th[e] position." *Id.* at 56. Ms. Young testified that "it would eliminate those positions." *Id.*

### 3. Plaintiff's Medical Records

On February 25, 2004, Plaintiff was referred to physical therapy for Achilles tendinitis on his right side. AR at 296. On July 7, 2008, Plaintiff was seen by Benjamin Douglas, M.D. regarding ringing in his ears. *Id.* at 279-80. Dr. Douglas reported that "[a]udio shows sensorineural hearing loss sharply falling above 2000 Hz." *Id.* at 280. Dr. Douglas further noted that there may be "some component of allergic rhinitis contributing to the ear fullness and the severity of his tinnitus symptoms[,] [and] [t]he problem, however, is noise-induced hearing loss, which would be difficult to amplify given the current profile." *Id.* at 280.

On July 1, 2009, Plaintiff had a chest x-ray, which indicated "[n]o acute intrathoracic abnormality. *Id.* at 344. On July 3, 2009, Plaintiff was seen by Frank VanMiddlesworth, M.D. for his six month check up on diabetes and blood pressure. AR at 301-03. Dr. VanMiddlesworth noted that Plaintiff had "not taken care of [him]self in [the] past 6 [months], stress with wife having surgeries total knee replacement and cataract surgeries and total pelvic reconstruction surgery[.]" *Id.* at 301. Dr. VanMiddlesworth further noted that Plaintiff's hypertension is "[v]ery difficult to treat; intolerant of most medications[.]" *Id.* Dr.

1    VanMiddlesworth's assessment included Type 2 diabetes, renal calculus, malignant

2    hypertension, and microalbuminuria.  *Id.* at 302.  On July 7, 2009, Plaintiff underwent a left

3    side lithotripsy with double J stent placement.  AR at 328-34, 341-42.  On July 10, 2009,

4    Plaintiff had the stent removed.  *Id.* at 327.  An x-ray showed "only a few small stone

5    fragments around the stent" remaining.  AR at 327, 343.

6         On August 6, 2009, Plaintiff underwent a kidney-ureter-bladder x-ray.  *Id.* at 339.

7    Upon comparison with his July 10, 2009 x-ray, this x-ray showed that "[t]he calcifications

8    dated in the distal left ureter at the level of the ureterovesical junction persists, unchanged."

9    *Id.*  On August 12, 2009, Plaintiff saw Jerome M. Marchuk, M.D. for a follow-up one month

10   after a stent placement and removal.  *Id.* at 326.  On August 24, 2009, Plaintiff had laboratory

11   tests regarding the kidney stones.  *Id.* at 345-50.

12        On September 14, 2009, Plaintiff saw Dr. Marchuk "to go over his metabolic stone

13   work up."  AR at 323-25.  Dr. Marchuk's assessment noted "recurrent renal stone disease[,]

14   [and] [e]levated urinary uric acid levels."  *Id.* at 323.  Dr. Marchuk stated that "[t]he stone

15   studies suggest that the patient would benefit from allopurinol on daily basis, as well as a

16   reduced oxalate diet."  *Id.*  On December 31, 2009, Plaintiff saw Dr. VanMiddlesworth for

17   a check up.  AR at 304-06. Dr. VanMiddlesworth physical examination was unremarkable.

18   *Id.* at 305-06.

19        On May 18, 2010, Plaintiff was seen by Richard Hoodenpyle, D.M.D. for an

20   evaluation.  AR at 282.  Dr. Hoodenpyle performed deep scaling of each of the four (4)

21   quadrants of Plaintiff's mouth.  *Id*.  On July 22, 2010, Plaintiff saw Mark R. Hendrick, M.D.,

22   and was evaluated for left heel pain.  AR at 289, 293-95.  Dr. Hendrick noted that Plaintiff

23   "was last seen at Blue Ridge Bone & Joint Clinic in 08/2004 for postoperative followup for

24   a right posterior heel procedure by Dr. Mangone on 12/02/2003."  *Id.* at 289.  Plaintiff's left

25   heel pain had been "present for quite some time with no trauma, associated with some minor

26   swelling, difficulty with shoe wear and activity[,] [i]t has progressed."  *Id.*  Dr. Hendrick

27   reviewed Plaintiff's x-rays and noted "a small calcific spur at the Achilles tendon insertion,

28

mild Haglund's deformity and no other bony abnormalities." AR at 289. Dr. Hendrick diagnosed "[l]eft posterior heel syndrome with insertional Achilles tendinitis and tendinosis, retrocalcaneal bursitis and Haglund's deformity." *Id.*

On August 6, 2010, Plaintiff had laboratory work performed. *Id.* at 354-62, 369-76. On August 19, 2010, Plaintiff saw Dr. Hendrick for "his preoperative evaluation prior to his left Achilles tenosynovectomy, retrocalcaneal bursectomy, [and] calcaneal exostectomy." *Id.* at 288. There were "no significant findings" on physical examination. *Id.* On August 30, 2010, Plaintiff saw Dr. VanMiddlesworth for a check-up. AR at 307-09. Dr. VanMiddlesworth's physical examination of Plaintiff was unremarkable. *Id.* at 308-09.

On September 10, 2010, Plaintiff underwent a left insertional Achilles tenosynovectomy and retrocalcaneal bursectomy, and left calcaneal exostectomy. *Id.* at 290-91. Plaintiff opted for "surgical intervention in an attempt to improve his pain." *Id.* at 290. There were no complications during the surgical procedure. *Id.* at 291. On September 16, 2010, Plaintiff had his Prostate-Specific Antigen ("PSA") levels analyzed. AR at 352, 368, 425. On September 20, 2010, Plaintiff saw Dr. Hendrick for a postoperative follow-up. *Id.* at 287. Dr. Hendrick noted that he was "[h]ealing very nicely without evidence of continuing problems or infection." *Id.* On September 15, 2010, Plaintiff saw Dr. Marchuk for a follow up regarding his kidney stones. *Id.* at 320-22. Dr. Marchuk reported that Plaintiff's "[u]rinalysis is completely unremarkable[,]" as was his physical examination. *Id.* at 320. Dr. Marchuk also noted that Plaintiff "has not had any systemic gouty flare-ups since he has been on allopurinol[.]" AR at 320.

On January 5, 2011, Plaintiff was seen by Elsi Diaz, M.D. for a physical examination, which was unremarkable. *Id.* at 406-08. On the same date, Plaintiff also had his Vitamin D level checked. *Id.* at 424. On January 26, 2011, Plaintiff again saw Dr. Diaz. *Id.* at 403-05. Dr. Diaz reported an unremarkable physical examination. *Id.* at 404. The following day, Plaintiff had laboratory analyses performed. AR at 420-24.

On February 16, 2011, Plaintiff saw Dr. Diaz to discuss his lab results. *Id.* at 400-02.

1    Plaintiff's physical examination was unremarkable.  *Id.* at 401.  On February 23, 2011,

2    Plaintiff saw Dr. Diaz with ear discomfort.  *Id.* at 397-99.  Plaintiff's physical examination

3    was unremarkable; however, Plaintiff reported that his hearing was getting worse. *Id.* at 397-

4    98.  On February 28, 2011, Plaintiff saw William Kuo, M.D. for a new patient consult

5    regarding his kidney stones.  AR at 379-81; 415-17.  Dr. Kuo's physical examination was

6    unremarkable.  *Id.* at 380, 416.  Plaintiff's urinalysis was also normal.  *Id.*  On the same date,

7    Plaintiff was examined by Thomas J. Tilsner, M.D. regarding his tinnitus.  *Id.* at 414.

8    Plaintiff reported to Dr. Tilsner that four (4) weeks prior, he had been "given a new blood

9    pressure medication, and then he began to note increased tinnitus as well as congestion in the

10   left ear." *Id.*  Dr. Tilsner's examination was normal, and he gave Plaintiff samples of Medrol

11   Dosepak and Lipoflavinoid.  *Id.*

12           On March 14, 2011, Plaintiff was seen in the Emergency Department at Holy Cross

13   Hospital regarding right flank pain.  AR at 473-75.  Plaintiff was in mild distress, and a

14   kidney stone was indicated.  *Id.* at 475.  On the same date, Plaintiff had a Computed

15   Tomography ("CT") scan of his abdomen without contrast.  *Id.* at 366-67.  The CT

16   demonstrated "[d]iffuse fatty infiltration of the liver . . . no nephro or ureterolithiasis[,] . . .

17   aortic atherosclerosis without evidence of aneurysm[,] . . . small fat containing inguinal

18   hernias bilaterally, slightly larger [on the] left than right." *Id.* at 366.  On April 21, 2011,

19   Plaintiff had blood work analyzed.  *Id.* at 419.

20           On May 12, 2011, Plaintiff was seen by James Gordon, M.D. for an "evaluation of

21   sudden sensorineural hearing loss."  AR at 384-85.  Dr. Gordon reported "[s]udden

22   sensorineural hearing loss in the left ear with poor speech discrimination, which would be

23   concerning for retrocochlear pathology."  *Id.* at 384.  Dr. Gordon further indicated that

24   Plaintiff "definitely necessitates an M[agnetic ]R[esonance ]I[maging] [("MRI")] of the

25   internal auditory canal."  *Id.*  On May, 19, 2011, Plaintiff saw Dr. Diaz for a follow-up.  *Id.*

26   at 394-96.  Dr. Diaz reported that Plaintiff was "adamant to change medications at this

27   moment."  *Id.* at 394-95.  Plaintiff's physical examination was unremarkable.  AR at 395.

28

On June 14, 2011, Plaintiff was evaluated by Randall Cohen, M.D. for "sudden left-sided hearing loss." *Id.* at 388-89, 409-12, 526-29. Dr. Cohen's physical examination was unremarkable. *Id.* at 388, 411-12, 528-29. Dr. Cohen reported that Plaintiff had poor speech discrimination on the left side, and audiologic testing indicated "[a]symmetrical, sensorineural hearing loss with the right ear mild to severe high-frequency; left ear moderate to severe." *Id.* at 388, 412, 529; *see also* AR at 390-91; 413. Audiological testing was performed by Heather Nair, M.S. *Id.* at 390-91, 413, 530.

On July 6, 2011, Plaintiff underwent an MRI of his brain. AR at 387, 525. The MRI showed "[p]rominent cerebrospinal fluid intensity noted in the left middle cranial fossa, anterior left temporal lobe measuring approximately 29 mm transverse x 17 mm anteroposterior likely reflecting arachnoid cyst[,] [and] [n]o evidence of abnormal parenchymal or meningeal enhancement." *Id.* Additionally, "[r]esolution images through the posterior fossa demonstrate[d] symmetric internal auditory canals with no evidence of abnormal enhancement or mass." *Id.* On August 9, 2011, Plaintiff had blood work analyzed. *Id.* at 418, 452.

On September 15, 2011, Plaintiff followed up with Dr. Cohen regarding his hearing loss. *Id.* at 521-24. Dr. Cohen's physical examination of Plaintiff was unremarkable. AR at 523-24. Dr. Cohen noted "[t]ympanometry consistent with normal middle ear function bilaterally." *Id.* at 524. Dr. Cohen further noted that "[o]toacoustic emissions show right high frequency cochlear dysfunction; left broad spectrum cochlear dysfunction." *Id.* Dr. Cohen also reported that "on our testing the hearing discrimination increased by 20%[,] . . . a significant improvement." *Id.* As such, Dr. Cohen found that "the hearing in this ear now is potentially amenable to amplification with a hearing assistive device." *Id.* On the same date, Plaintiff saw Ms. Nair for a hearing aid consult. AR at 519-20. On September 29, 2011, Plaintiff saw Dr. Diaz regarding bilateral hand pain, a rash on his pain, and heel pain. *Id.* at 446-48. Plaintiff's physical examination was otherwise unremarkable. *Id.* at 447. Dr. Diaz referred Plaintiff to Neurology for a consult, and Orthopedics for evaluation and

1    treatment. *Id.* at 448. On the same date, Plaintiff had blood work analyzed. *Id.* at 450-51.

2         On October 6, 2011, Plaintiff was seen by Ms. Nair "for fitting of left unilateral

3    hearing aid." AR at 517-18. Ms. Nair reported that Plaintiff "has a bilateral loss but has

4    chosen to aid the poorer ear first with an advanced level hearing aid." *Id.* at 517. Ms. Nair

5    further reported that Plaintiff "also chose the left ear first due to bothersome tinnitus that will

6    hopefully be masked by the high frequency amplification." *Id.*

7         Pursuant to request by the Arizona Department of Economic Security ("AZDES"),

8    Plaintiff was examined by Jerome Rothbaum, M.D. on October 14, 2011. *Id.* at 426-33. Dr.

9    Rothbaum indicated that he had reviewed Plaintiff's medical records as part of his

10   examination. *Id.* at 426. Dr. Rothbaum reported Plaintiff's chief complaints as "diffuse joint

11   pains, problems with his ankles, status post multiple surgical procedures, diabetes mellitus,

12   history of gout, [and] low back pain with sciatica." AR at 426. Dr. Rothbaum noted that

13   Plaintiff indicated that "he has had low back pain for many years[,] [i]t is primarily in the left

14   paralumbar area but he also gets intermittent radicular type pain." *Id.* In addition to the

15   surgeries noted in Plaintiff's medical records, Dr. Rothbaum indicated that Plaintiff had

16   undergone surgery for glaucoma in both eyes in 1998. *Id.* at 427. Dr. Rothbaum noted

17   Plaintiff's substantial hearing loss, and reported that he had "acquired [a] hearing aid for the

18   left ear only during the past week[,] [and] [h]e is not certain if it is helpful." *Id.* at 427.

19   Plaintiff's physical examination was unremarkable. AR at 427-28. Dr. Rothbaum noted that

20   Plaintiff "does tend to at least partially read lips." *Id.* at 427. Dr. Rothbaum further noted

21   that although Plaintiff walks normally and was able to "get[] up and down from the

22   examining table without difficulty[,] . . . [h]e is unable to squat . . . due to [the] condition of

23   his ankles." *Id.* at 428.

24        Dr. Rothbaum also completed a "Medical Source Statement of Ability to Do Work-

25   Related Activities (Physical)" regarding Plaintiff. *Id.* at 429-31. Dr. Rothbaum diagnosed

26   Plaintiff with diabetes mellitus type 2, status post tenosynovectomy, Achilles tendinitis,

27   degenerative disc disease lumbar, hearing loss. *Id.* at 429. Dr. Rothbaum opined that these

28                                         - 14 -

would impose a limitation for twelve (12) continuous months.  *Id.*  Dr. Rothbaum further opined that Plaintiff was limited in his ability to lift and/or carry to twenty (20) pounds occasionally, and 10 pounds frequently.  AR at 429-30.  Dr. Rothbaum noted Plaintiff would be limited in his ability to stand and/or walk, concluding that Plaintiff "should be capable of standing and walking 4 to 5 hours per day, 1 hour at a time, 5 minute break due to lumbar degenerative disc disease, status post tenosynovectomy, Achilles tendinitis." *Id.* at 430.  Dr. Rothbaum further opined that Plaintiff had no limitation in sitting, and was unlimited in seeing and speaking, but limited in hearing.  *Id.*  Dr. Rothbaum stated that Plaintiff has "rather significant hearing loss, worse on the left than the right[,] . . . [and] [has] amplification on the right which does not appear to be optimal at this time." *Id.* at 430.  Dr. Rothbaum indicated that Plaintiff could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and had no limitation on reaching, handling, fingering or feeling.  *Id.* at 431.  Dr. Rothbaum also indicated that Plaintiff was restricted in working around heights, moving machinery, and excessive noise, but was unrestricted with regard to working around extremes in temperature, chemicals, dust, fumes, or gases.  AR at 431.

On October 18, 2011, Plaintiff followed up with Ms. Nair. *Id.* at 515-16.  Plaintiff had been fit with a left aid, but stated that "the left aid just makes the distortion worse and provides no improved communication or tinnitus relief." *Id.* at 515.  Ms. Nair reported that Plaintiff was directed to "use alternative programs to optimize speech discrimination[,]" and planned to "aid the right ear [upon follow-up] . . . to see if it improves [Plaintiff's] preception [sic]." *Id.*  On October 20, 2011, Plaintiff again saw Ms. Nair for a follow-up. *Id.* at 513-14.  Plaintiff was having "difficulty with [the] left receiver 'popping out' of ear[,]" despite a previous refitting.  *Id.* at 513.  Ms. Nair further reported that Plaintiff did not have any "improved speech clarity or understanding from the left ear aiding." AR at 513.  On the same date, pursuant to request by the Commissioner, Plaintiff's medical records were reviewed by Charles Fina, M.D. *See id.* at 58-69.  On October 25, 2011, Plaintiff seen at

1  Southwestern Eye Center for an intraocular pressure check. *Id.* at 440-42.  Glaucomatous

2  features were noted on the Optic Nerve. *Id.* at 442.

3       On January 26, 2012, Plaintiff had blood work analyzed. *Id.* at 449, 472.  On

4  February 21, 2012, Plaintiff saw Dr. Diaz for a follow-up visit.  AR at 462-64.  Dr. Diaz's

5  physical examination was unremarkable, but she noted "[o]steoarthrosis, generalized,

6  involving multiple sites" and "[a]cute gastritis" in her assessment. *Id.* at 463.  On the same

7  date, Plaintiff had laboratory work performed. *Id.* at 468-71.

8       Pursuant to request by the Commissioner, on March 13, 2012, Plaintiff's medical

9  records were reviewed on reconsideration by John B. Kurtin, M.D. *See id.* at 70-84.  On

10  March 26, 2012, Plaintiff saw Dr. Diaz regarding blood in his urine three (3) days prior. *Id.*

11  at 476-78.  Plaintiff reported that upon starting ampicillin, the blood disappeared.  AR at 476.

12  Dr. Diaz's physical examination of Plaintiff was otherwise unremarkable. *Id.* at 478.  On the

13  same date, Plaintiff had laboratory work performed. *Id.* at 466-67.

14       On June 14, 2012, Plaintiff had blood work analyzed. *Id.* at 465.  On June 26, 2012,

15  Plaintiff saw Dr. Diaz for a follow-up after hospitalization with kidney stones. *Id.* at 479-82.

16  Plaintiff's physical examination was unremarkable. *Id.* at 481-82.  On June 28, 2012,

17  Plaintiff saw Alfredo Guevara, Jr., M.D. "for evaluation of right ureteral colic."  AR at 509.

18  Plaintiff was instructed to have kidney-ureter-bladder films taken, and to return the following

19  day. *Id.* at 509.  Plaintiff's films showed "a 5 mm calculus between the right L2 and L3

20  transverse processes." *Id.* at 510-12.  Upon comparison to a prior CT from June 15, 2012,

21  "[t]he position [did] not appear significantly changed from the previous exam." *Id.* at 510.

22  Degenerative changes in the lumbar spine were also noted. *Id.*  On June 29, 2012, Plaintiff

23  returned to Dr. Guevara regarding the "5 x 4 mm stone in the right upper ureter."  AR at 508.

24  Dr. Guevara assessed Plaintiff with "[r]ight ureter colic associated with right hydronephrosis

25  secondary to [the stone]." *Id.*  Dr. Guevara further assessed minimal bladder outlet

26  obstruction and lower urinary tract symptomatology secondary to benign prostatic

27  hyperplasia. *Id.*  Dr. Guevara's plan included a cystogram and extracorporeal shock wave

28

1   lithotripsy ("ESWL") of the right kidney.  *Id.*

2       On July 5, 2012, Plaintiff was seen at Holy Cross Hospital for ESWL of his right

3   kidney stone.  *Id.* at 485-93, 506-07.  On July 16, 2012, Plaintiff followed up with Dr.

4   Guevara after the ESWL.  AR at 505.  On July 28, 2012, Plaintiff saw Dr. Guevara for

5   removal of the stent.  *Id.* at 504.

6

7       **II.**    **STANDARD OF REVIEW**

8       The factual findings of the Commissioner shall be conclusive so long as they are

9   based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3);

10  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the

11  Commissioner's denial of disability insurance benefits when the ALJ's findings are based

12  on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*

13  *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v.*

14  *Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

15      Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

16  preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

17  873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

18  Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

19  as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

20  Where "the evidence can support either outcome, the court may not substitute its judgment

21  for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

22  1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

23  Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must

24  consider the entirety of the record weighing both evidence that supports as well as that which

25  detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

26  . . .

27  . . .

28                            - 17 -

III.   **ANALYSIS**

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2015, and was not engaged in substantial gainful activity since July 5, 2009.  AR at 25.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: diabetes, degenerative disc disease, hearing loss, and status post bilateral [A]chilles tendonitis (20 CFR 404.1520(c))."  *Id.*  At step three, the ALJ found that Plaintiff does "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  *Id.*  At step four, the ALJ found that Plaintiff had:

> the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) except that the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently; is able to sit 6 hours in an 8 hour day; is able to stand 4 hours in an 8 hour day; is able to walk 4 hours in an 8 hour day; requires a sit/stand option; is able to occasionally climb stairs; is unable to climb ladders; is able to occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to heights, moving machinery, and excessive noise.

*Id.* at 26.  Accordingly, the ALJ found, based in part upon the Vocational Expert's testimony, that "[t]he claimant is capable of performing past relevant work as an inventory control clerk and sales representative of food products, . . . [because] [t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)."[3]  *Id.* at 30.  As such, the ALJ found that Plaintiff was "not under a disability, as defined in the Social Security Act, from July 5, 2009, through the date of this decision (20 CFR 404.1520(f))."  AR at 30.  Plaintiff asserts that the ALJ erred in  1) finding that Plaintiff needs a "sit/stand option" because it is ambiguous and unreviewable; and 2) finding that Plaintiff could perform his past relevant work as an inventory control clerk or sales representative.  Pl.'s Opening Brief (Doc. 15) at 5-11.

### A.    *Sit/Stand Option*

Plaintiff asserts that the ALJ's inclusion of a "sit/stand option" in her RFC determination is materially ambiguous and not supported by substantial evidence.  Pl.'s Opening Br. (Doc. 15) at 5-8.  The Commissioner argues that "[a]lthough the ALJ did not specify the frequency and length of time Plaintiff would need to stand, the finding was sufficient."  Def.'s Response (Doc. 17) at 4.

Plaintiff cites SSR 96-9p to support his argument that the ALJ's finding that he needs a "sit/stand option is materially ambiguous and thus unreviewable."  Pl.'s Opening Br. (Doc. 15) at 4.  The stated purpose of SSR 96-9p is as follows:

> To explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary work on an individual's ability to do other work.  In particular, to emphasize that:
>
> 1. An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare.

[3]The ALJ also mentions food preparer as Plaintiff's past relevant work; however, this appears to be an error, as this job does not appear anywhere in the Administrative Record. Defendant concedes the error, but asserts that such error is harmless.  Def.'s Response (Doc. 17) at 7.

1

2.  However, a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled."  If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.

SSR 96-9p.  Plaintiff cites *Barrera v. Astrue*, 2012 WL 4361416 (D. Ariz. Sept. 25, 2012) and *Arnett v. Astrue*, 676 F.3d 586 (7th Cir. 2012), both of which relied on SSR 96-9p to hold that an ALJ must specify the frequency of the claimant's need to alternate sitting and standing.  *See* Pl.'s Opening Br. (Doc. 15) at 7.  Plaintiff further asserts that the Defendant "neglected the principle of SSR 96-9p" in arguing that it does not apply in the instant case.  Pl.'s Reply (Doc. 18) at 7.  Plaintiff's contention is without merit.

Here, the ALJ found that Plaintiff is capable of performing a range of light work. AR at 26.  In reaching this conclusion, the ALJ "did exactly what the caselaw and SSR 83-12 direct him to do – he consulted a VE."  *Moore v. Apfel*, 216 F.3d 864, 870 (9th Cir. 2000).  SSR 83-12 provides "a framework for adjudicating claims in which an individual has only exertional limitations, and no specific rule applies because the individual's residual functional capacity (RFC) does not coincide with any one of the defined exertional ranges of work."  SSR 83-12.  Similar to the Plaintiff in the instant case, the claimant in *Moore* had both exertional and non-exertional limitations.  The court in *Moore*, found that SSR 83-12 and the presence of both exertional and non-exertional limitations mandate the use of a VE, and where the ALJ followed this procedure, there was no error.  *Moore*, 216 F.3d at 870; *see also Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988).  Therefore, the erosion of the occupational base of light work options was sufficiently addressed by the VE.

### B.    ALJ's Step Four Findings

Plaintiff asserts that "substantial evidence does not support the ALJ's as-actually-performed step-four findings."  Pl.'s Opening Br. (Doc. 5) at 8.  Plaintiff further asserts that the ALJ's alleged error in relying on a sit/stand option vitiated her as-generally-

- 20 -

1   performed step four findings.  *Id.*   The Commissioner argues that substantial evidence

2   supports the ALJ's findings, and her error in stating Plaintiff had past relevant work as a

3   food preparer is harmless.  Def.'s Response (Doc. 17) at 6-7.

4       Here, the ALJ asked the VE a hypothetical regarding an individual of the same

5   age, education, and vocational background as the Plaintiff.  *See id.* at 54.  In the

6   hypothetical, the ALJ asked about someone who could "sit six hours out of an eight hour

7   day, stand four hours out of an eight hour day and walk four hours out of an eight hour

8   day, requires a sit, stand option to perform a job, can occasionally lift and carry 20

9   pounds, frequently lift and carry 10 pounds, can only occasionally climb stairs, never

10  climb ladders, occasionally balance, stoop, kneel, crouch and crawl[,] and . . . must avoid

11  concentrated exposure to heights, moving machinery and excessive noise."  *Id.* at 54.  The

12  ALJ inquired whether such an individual could perform "any of the jobs performed by

13  [Plaintiff] in the past either as he performed them or as they're performed in the national

14  economy."  AR at 54.  Ms. Young testified that small business owner would be

15  eliminated, but the inventory control clerk and sales representative food products jobs

16  would be available.  *Id.* at 54-55.  Ms. Young further testified that although this would be

17  a deviation from the DOT, she based her opinion on her personal experience as a

18  vocational rehabilitation counselor since 1983.  *Id.* at 55.  Plaintiff's counsel asked the

19  VE, "so if I understand what you're saying is that the he [sic] can perform the past

20  relevant work of the two jobs because they don't require as much walking or standing?"

21  *Id.* at 56.  The VE responded, "I believe that the walking or standing, walking for up to

22  four hours, standing for up to two hours then sitting for six to eight would, those jobs

23  could be done with that particular set of limitations."  *Id.*  As such, the ALJ's reliance on

24  the VE supports her Step Four finding, and there is no error.  Additionally, the Court

25  finds that the ALJ's error in referring to food preparer as past relevant work was

26  harmless.  *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

27

28                                    - 21 -

1    **V.**    **CONCLUSION**

2    In light of the foregoing, the Court affirms the Commissioner's decision.

3

4    Accordingly, IT IS HEREBY ORDERED that:

5    1)    Plaintiff's Opening Brief (Doc. 15) is DENIED;

6    2)    The Commissioner's decision is AFFIRMED; and

7    3)    The Clerk of the Court shall enter judgment, and close its file in this matter.

8    DATED this 30th day of March, 2015.

9

10   _____

11                        Bruce G. Macdonald
                    United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28